**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

_____

JOHN J. SPEICHER, *et al.*,  :  CIVIL ACTION
                    Plaintiffs,  :
                                         :
          v.                               :  No.  5:22-cv-4284
                                         :
ROCKET MORTGAGE, LLC,   :
                    Defendant.  :
_____

**O P I N I O N**
**Defendant's Motion for Summary Judgment, ECF No. 37 – Granted**

Joseph F. Leeson, Jr.                                             **January 2, 2024**
United States District Judge

## I.     INTRODUCTION

Plaintiffs brought this action against Rocket Mortgage alleging a violation of the

Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), and common law

fraud, arising out of Rocket Mortgage's denial of Plaintiffs' mortgage loan application.  Summary

judgment is granted because Plaintiffs have not purchased anything from Rocket Mortgage and thus

cannot assert a claim arising under the UTPCPL.  Summary judgment is also granted as to the claim

for common law fraud because Plaintiffs have failed to establish damages with any reasonable

certainty or justifiable reliance upon any misrepresentation.

## II.     BACKGROUND

### A.     Procedural History

On October 26, 2022, Plaintiffs filed suit against Rocket Mortgage ("RM") alleging seven

claims: (1) Count I: Breach of Contract; (2) Count II: Negligence; (3) Count III: Fraud; (4) Count

IV: Breach of Contract brought by Patricia Giles as a third-party beneficiary; (5) Count V: Breach

of Contract, Specific Performance; (6) Count VI: Violations of the Truth in Lending Act ("TILA");

and (7) Count VII: Violations of UTPCPL.  *See* Compl., ECF No. 1.  On February 7, 2023, RM

filed a Motion to Dismiss.  *See* Mot., ECF No. 6.  In an Order entered April 11, 2023, the Court dismissed Counts I, IV, and V with prejudice, Counts II and VI without prejudice, and denied the Motion to Dismiss as to Counts III and VII.  *See* ECF No. 12.

Plaintiffs filed an Amended Complaint on April 17, 2023, alleging four claims: (1) Count I: Common-Law Fraud; (2) Count II: Violation of TILA; (3) Count III: Violations of UTPCPL; and (4) Count IV: Negligence.  *See* Am. Compl., ECF No. 13.  On May 2, 2023, RM filed a Motion to Dismiss.  *See* ECF No. 14.  On June 7, 2023, this Court dismissed Counts II and IV with prejudice. *See* ECF No. 18.  On June 21, 2023, RM filed an Answer to the Amended Complaint.  *See* Def.'s Ans., ECF No. 19.

The matter is now before the Court on RM's Motion for Summary Judgment on both remaining counts.  *See* ECF No. 37.  The matter is fully briefed and ready for disposition.  For the reasons that follow, the motion is granted.

**B.      Undisputed Material Facts**

Plaintiffs are John J. Speicher, Patricia C. Giles, Jeremy G. Speicher, and Courtney Speicher who own real property located in North Carolina.  Def.'s Stmt. Fact ("DSF") ¶ 1, ECF No. 37; Pls.' Resp. Def.'s Stmt. Fact ("PRSF") ¶ 1, ECF No. 44.  That property was financed with an adjustable-rate mortgage at a rate of 3.75% which was scheduled to increase to 5.75% in February of 2023. PRSF ¶ 2, Def. Reply Stmt. Fact ("DRSF") ¶ 2.  In February of 2022, John and Jeremy Speicher contacted Rocket Mortgage with the intent of applying for approval for a new fixed rate mortgage with an additional cash-out refinance.  DSF ¶ 3, PRSF ¶ 3.  At the outset of the loan application, Plaintiffs placed a $500 good faith deposit.  *Id.* ¶ 29.

John's finances and employment lie at the center of this litigation.  John's loan application referenced four sources of income: dividends, social security, base salary, and commissions.  *Id.* ¶ 7. As proof of his income, on or around February 28, 2022, John supplied RM with his 2019 and 2020

personal tax returns, 2020 and 2021 W-2 wage and tax statements, current paystubs, payroll summaries for the years 2020 and 2021 and year-to-date 2022, and an award letter documenting his social security and dividend income.  *Id.* ¶ 8.

On March 3, 2022, RM informed John and Jeremy that they were conditionally approved for a 3.99% loan.  *Id.* ¶ 10.  The letter stated that loan approval was subject to receipt and approval of proof of social security income, recent mortgage statements, appraisal delivery waiver form, and other information regarding the appraisal.  *See* Ex. R, ECF No. 37.  The letter contained the additional disclosure:

> As you gather and send the items above, we will be obtaining and reviewing items from various third parties.
>
> . . .
>
> Once we receive the items from you and the third parties, we will conduct a final review of the loan documents.  As soon as we complete the review and issue a final approval, we will contact you to coordinate your closing.

*Id*.  After this conditional approval, RM requested additional information regarding John's income and employment.

John was a partner at the law firm of Leisawitz Heller from February 2001 until January 1, 2022, when the firm became affiliated Barley Snyder LLP.  DSF ¶ ¶ 12-13; PRSF ¶ ¶ 12-13.  While the parties dispute the nature of the affiliation, John joined Barley Snyder on January 1, 2022.  *Id.* ¶ 14.  There, John held the position of non-equity of counsel at a base salary of $75,000.  *Id.*  John also retained the right to receive a commission from Leisawitz Heller for pre-existing matters that settled or resolved after January 1, 2022.  *Id.* ¶ 16.

On March 22, 2022, RM issued a closing disclosure with a proposed March 30, 2022, closing date.  *Id.* ¶ 30, (citing Ex. CC, ECF. No. 37).  Notwithstanding, RM requested and received a written verification of employment from Barley Snyder on March 30, 2022.  DSF ¶ 18; PRSF ¶ 18.  On March 31, 2022, Sam Ward, a RM Solutions Consultant, contacted Jeremy Speicher and

discussed John's employment and income status. *Id.* ¶¶ 23, 24.  On March 31 and April 15, RM issued subsequent Closing Disclosures with proposed closing dates of April 5 and April 25 respectively. *Id.* ¶ 32.

Jeremy and Sam spoke again on April 15, 2022, and discussed additional income related documents. *Id.* ¶ 26.  During that call, Ward informed Jeremy that he had extended the interest rate lock until May 2, 2022. *Id.*  On April 19, John submitted an additional pay stub to RM. *Id.* ¶ 27.  On April 20, 2022, RM sent John and Jeremy a letter denying their loan application citing "unverifiable information." Ex. AA, ECF No. 37.  RM refunded the $500 deposit. DSF ¶ 29; PRSF ¶ 29.  Notwithstanding, RM offered to restart the loan application process, albeit at a 5.324% interest rate. Ex. BB, ECF. No. 37.  Plaintiffs declined to do so.

Throughout the loan process, John and Jeremy believed they were qualified for the loan but understood that "nothing was guaranteed." *Id.* ¶¶ 35, 36 (citing John Speicher Dep. Trans. at 149:17-21, 172:6-9, 190:10-191:1, 240:4-241:19 (Ex. A, ECF No. 37); Jeremy Speicher Dep. Trans. at 168:21-169:8, 169:15-18, 215:4-14, 218:2-16, 252:25-253:4, 259:13-24 (Ex. B, ECF No. 37)).  Plaintiffs did not submit loan applications to any other institutions in an effort to refinance the existing mortgage. *Id.* ¶ 37.

## III.   LEGAL STANDARDS — Review of Applicable Law

### A.   Summary Judgment – Review of Applicable Law

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 257.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  The court must consider the evidence in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

   **B.     Unfair Trade Practices and Consumer Protection Law – Review of Applicable Law**

The purpose of the UTPCPL is to protect consumers from unfair or deceptive business practices.  *Corsale v. Sperian Energy Corp.*, 374 F. Supp. 3d 445, 459 (W.D. Pa. 2019).  It prohibits, among other things, unfair or deceptive acts that include "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).  To establish a claim for a "deceptive" act under the UTPCPL, a plaintiff must allege "(1) a deceptive act, that is conduct that is likely to deceive a consumer acting reasonably under similar circumstances; (2) the plaintiffs justifiable reliance on that deceptive act; and (3) that the plaintiff's justifiable reliance resulted in ascertainable loss." *Corsale*, 374 F. Supp. 3d 445, 459.

C.      **Common-Law Fraud – Review of Applicable Law**

To prove common-law fraud, a claimant must show six things: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *Blumenstock v. Gibson*, 811 A.2d 1029, 1034 (Pa. Super. 2002). At trial, the claimant bears the burden of proving fraud by clear and convincing evidence. *Moser v. DeSetta*, 589 A.2d 679, 682 (Pa. 1991). Thus, at the summary judgment stage, the moving party "has the burden of showing that no reasonable jury applying the 'clear and convincing' standard could find in favor of Plaintiff at trial." *Woolley v. Groft*, 653 F. Supp. 3d 171, 185 (M.D. Pa. Jan. 27, 2023).

IV.     **ANALYSIS**

A.      **Unfair Trade Practices Act**

In this case, Plaintiffs allege that RM violated the UTPCPL by engaging in fraudulent and deceptive conduct. The Court finds that RM is entitled to summary judgment on the UTPCPL claim because Plaintiffs have not purchased anything and thus cannot bring a private cause of action under the statute.

The UTPCPL contemplates only purchasers as its protected class. *See Car Sense, Inc. v. Am. Special Risk, LLC*, 56 F. Supp. 3d 686, 697 (E.D. Pa. 2014). A party who "attempt[s] to enter into a bargain" or "has recognized a merchant's deceptive practices and accordingly has refused to make a purchase" cannot bring a private action under the UTPCPL. *See* 18A Summ. Pa. Jur. 2d Commercial Law § 20:39 (2d ed.); *see also Wise v. Am. Gen. Life Ins. Co.*, 459 F.3d 443, 452 (3d Cir. 2006) ("A plaintiff who seeks to enter into a contract for purchase but fails to do so may not bring a claim under the UTPCPL, even where the plaintiff is prevented from making the purchase by the defendant's allegedly fraudulent conduct.").

Accordingly, RM argues that because Plaintiffs did not purchase anything, they cannot bring a UTPCPL claim.  In support, RM cites *Geary v. Wells Fargo Bank* as analogous.  In *Geary*, the plaintiffs began receiving promotional emails from Wells Fargo Bank purportedly offering them a specially discounted mortgage refinance rate.  *Geary v. Wells Fargo Bank, N.A.*, No. CV 17-2468, 2017 WL 3226001 at *1 (E.D. Pa. July 31, 2017).  Enticed by the offer, the plaintiffs engaged Wells Fargo regarding a mortgage refinance.  *Id*.  The plaintiffs believed they had reached an express agreement with Wells Fargo to lock in a 2.5% interest rate until Wells Fargo breached the purported agreement when it reneged on the locked in refinance rate.  *Id.*  The Court dismissed the plaintiffs' UTPCPL claim holding that they were not purchasers and thus not entitled to bring a claim arising under the UTPCPL because their "entire Complaint [was] predicated on the allegation that [the plaintiffs] failed to enter into a subsequent transaction."  *Id.* at *2.

Plaintiffs distinguish *Geary* by arguing that, unlike *Geary*, they paid a deposit for the application process.  Therefore this claim turns on whether a refunded deposit constitutes a purchase under the UTPCPL.  The Court holds that it does not.  Plaintiffs aver that the deposit was used to pay for the costs of processing the application.  Pls.' Resp. at 6-7.  However the deposit was refunded in full and much like *Geary*, the controversy in this matter is predicated on a *failure* to enter into a transaction.  Notwithstanding the premise that consumer protection claims are to be liberally construed, *see Com. ex rel. Corbett v. Snyder*, 977 A.2d 28, 44 (Pa. Commw. 2009), Plaintiffs' UTPCPL claim fails because they have not purchased anything.

### B.      Common-Law Fraud

Regarding the common-law fraud claim, RM argues that it is entitled to summary judgment on several grounds.  First, RM argues that Plaintiffs have failed to establish damages with any reasonable certainty.  Second, RM argues that it made no misrepresentation to Plaintiffs and, in the

alternative, to the extent it did, Plaintiffs cannot demonstrate justifiable reliance on any such misrepresentation.

### 1.    *Common-Law Fraud Damages*

RM argues that Plaintiffs have failed to establish damages with any reasonable certainty. "Under Pennsylvania law, in an action based on fraud, the measure of damages is 'actual loss', and not the benefit, or value, of that bargain." *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1257 (Pa. Super. 1983) (internal citations omitted). "The victim is entitled to all pecuniary losses which result as a consequence of his reliance on the truth of the representations." *Id*. "Damages are improperly speculative only if the uncertainty concerns the existence of damages rather than the amount of damages." *UPMC v. CBIZ, Inc*., 436 F. Supp. 3d 822, 835 (W.D. Pa. 2020).

Here, Plaintiffs' theory of damages is that they are entitled to the difference in cost between a 30-year mortgage at 5.324% and 3.99%. The 5.324% figure is the interest rate at which RM offered to restart the loan process after cancelling the initial 3.99% loan. Over the life of that mortgage, the difference in interest rate would cost Plaintiffs an additional $177,281.58. According to Plaintiffs, this figure is the actual damage which resulted from their reliance on RM's representations.

The Court finds this theory of damages too speculative. First, the Court agrees with RM that the 5.324% figure is arbitrary because Plaintiffs did not enter into a subsequent mortgage at that rate, nor were they guaranteed the loan. RM merely offered to restart the loan process at the higher rate. Second, layered into that speculation, is the inherently fluctuating nature of interest rates.[1]

---

[1]    RM argues that *Rusiski v Pribonic* forecloses *any* theory of damages based on a difference in interest rates. *See Rusiski v. Pribonic*, 515 A.2d 507 (Pa. 1986). While the Court need not go that far, the same concerns that informed the Pennsylvania Supreme Court's decision in *Rusiski* underlie this Court's holding that the theory of damages in this case is too speculative. For example, while the plaintiffs in *Rusiski* sought a twenty-year mortgage, the court noted that the average life of a

Third, the lack of subsequent agreement also strains Plaintiffs' theory of damages.  Fraud is a tort, and like all torts, the goal is to put the claimant back in the same place they were prior to the tortious action.  *See Werner v. Plater-Zyberk*, 799 A.2d 776, 784 (Pa. Super. 2002).  That is why fraud is compensable in actual damages which, as noted, are "those [damages] that will put the injured party in a position that he was in before he was injured."  *Killian v. McCulloch*, 850 F. Supp. 1239, 1253 (E.D. Pa. 1994).  That is exactly the case here.  The failed deal leaves Plaintiffs exactly where the Court found them, with the adjustable-rate mortgage that existed before they engaged RM.  Plaintiffs are not even out their $500 deposit.

The hallmark of a bait-and-switch fraud claim is that the claimant takes the bait – however gets the switch instead – and pending proof of fraud, can be compensated for the difference in value between the bait and the switch.  The facts of the instant case fall out of that mold and strain the claim beyond viability.  For these reasons, the Court grants summary judgment on the fraud count.

### 2.       *Rocket Mortgage's Purported Misrepresentations*

Further, RM argues, and the Court agrees, that summary judgment is also appropriate because Plaintiffs have failed to establish any misrepresentation or reliance thereupon.

For their part, Plaintiffs point to several misrepresentations as the basis of their fraud claim. They are: 1) RM's misrepresentation regarding Plaintiffs' qualification for the loan; 2) RM's misrepresentation regarding Plaintiffs' approval of a loan at a 3.99% interest rate; 3) RM's misrepresentation regarding the extension of the 3.99% interest rate through May 2, 2022; 4) RM's material omissions regarding Plaintiffs' suspended loan status; 5) RM's material omissions regarding the reason Plaintiffs' loan was suspended.

---

residential mortgage (at the time) was just 11.79 years.  *Id*. at 513.  Thus, awarding the difference in interest across the full life of the mortgage ignores the reality that "[m]any events occur which cause payments of mortgages to be accelerated" and in times of low interest rates, properties are often refinanced.  *Id*.  To ignore these realities is to ignore the unpredictable nature of interest rates.

> a. *RM's misrepresentation regarding Plaintiffs' qualification for the loan*

Plaintiffs argue that RM fraudulently misrepresented that Plaintiffs' application did not qualify for the loan.  Instead, RM manufactured reasons to deny the application because a 3.99% loan was less profitable given the rising interest rates.  Ultimately, the reason given for the denial was that RM had "unverifiable information" related to John's income.  *See* Ex. AA., ECF No. 37. According to Plaintiffs, RM was supplied all the relevant information and these 'excuses' were merely a pretext to back out of the loan so that the parties might restart the loan application at a higher interest rate.

However, returning to the elements of fraud, the Court reiterates its reasoning from its April 10, 2023, Opinion.  To sustain a claim of fraud, Plaintiffs must show that they *relied* upon the representation in question.  Here, Plaintiffs put forward no theory as to how they relied upon the representation that they were not qualified for a loan.  "Common sense supports the assumption that if Plaintiffs believed they did not qualify for the loan through Rocket Mortgage, then they would seek a loan elsewhere."  *Speicher v. Rocket Mortg., LLC*, No. 5:22-CV-4284, 2023 WL 2890154 at *5 (E.D. Pa. Apr. 11, 2023).  They did not.  Nor did they rely on these representations by capitulating and accepting a higher interest rate.  In fact, Plaintiffs maintain that they believed they qualified for a loan and thus believed this representation to be false.  *See* DSF ¶ 35; PRSF ¶ 35. "The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him."  Restatement (Second) of Torts § 541 (1977). Accordingly, this representation cannot form the basis of a fraud claim.

> b. *RM's misrepresentations regarding Plaintiffs' approval of a loan at a 3.99% interest rate and the extension of the 3.99% interest rate through May 2, 2022*

On this theory, to frame its analysis, the Court starts with Plaintiffs' own argument:

> What is demonstrated in the record is RM's scheme to avoid providing Plaintiffs with a loan at 3.99%, *as it represented it would*, only because the interest rates were increasing, and RM wanted to sell a loan at a higher rate.

Pls.' Resp. at 12 (emphasis added).  Thus, the purported misrepresentation is that RM would provide Plaintiffs with a loan at 3.99%.  Fleshed out, the theory is as follows.  RM represented that Plaintiffs would receive a loan at 3.99% through a March 3, 2022, letter in which RM congratulated Plaintiffs on being conditionally approved for a 3.99% mortgage, *see* Ex. R, ECF No. 37, and also in an initial closing disclosure issued March 22, 2022, *see* Ex. CC, ECF No. 37.

Plaintiffs argue that, having received a closing disclosure, they were now "clear to close" and should not have been ultimately denied a loan because, by RM's own representations:

> Clear-to-close buyers aren't usually denied after their loan is approved and they've signed the Closing Disclosure. But there are circumstances where a lender may decline an applicant at this stage. These rejections are usually caused by drastic changes to your financial situation. Leaving your job, applying for a new large credit line or taking out another loan can all be red flags for your mortgage lender. If it's possible, you should avoid making any drastic changes until the house is yours.

Rocket Mortgage, *Clear To Close: What To Expect And What Happens Next* (Dec. 20, 2023) https://www.rocketmortgage.com/learn/clear-to-close.  Nevertheless, and unbeknownst to Plaintiffs, the loan was soon placed on suspended status for several reasons.  Plaintiffs argue these reasons were pretextual and fraudulent in that they were designed to do away with a loan at 3.99% and instead offer a higher rate.

However at this point, the Court returns to the purported underlying representation: RM would provide Plaintiffs with a 3.99% loan.  Plaintiffs cannot avoid the fact that this representation was conditional and unguaranteed.  The conditional and unguaranteed nature of the representation begs the question as to whether Plaintiffs could have justifiably relied upon it or whether there was a misrepresentation at all.  "It is not enough simply to assert that a statement was fraudulent and that reliance upon it induced some action."  *Blumenstock v. Gibson*, 811 A.2d 1029, 1038 (Pa. Super. 2002).  Rather, the claimant must show that they justifiably relied on the statement.  *Id.*  "To be

justifiable, reliance upon the representation of another must be reasonable." *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1189 (Pa. Super. 2005) (quoting *Porreco v. Porreco*, 811 A.2d 566, 571 (Pa. 2002)).  "Furthermore, 'neither a court nor a jury can consider the issue [of justifiable reliance] without considering the relationship of the parties involved and the nature of the transaction.'" *Toy v. Metro. Life Ins. Co.*, 863 A.2d 1, 12 (Pa. Super. 2007) (quoting *Rempel v. Nationwide Life Ins. Co.*, 370 A.2d 366, 368 (Pa. 1977)).  While "justifiable reliance is typically a question of fact for a fact-finder to decide," *DeArmitt v. New York Life Ins. Co.*, 73 A.3d 578, 593 (Pa. Super. 2013), the claimant must still present at least some facts which tend to show the reliance was justified.  *See Kirwin v. Sussman Auto.*, 149 A.3d 333, 337 (Pa. Super. 2016).

On this element, the Court notes three things.  First, the website statement does not purport to list *all* the circumstances in which a conditionally approved loan may be denied.  Second, the letter of conditional approval also explains that that RM would be "obtaining and reviewing items from various third parties" and that "[o]nce we receive the items from you and the third parties, we will conduct a final review of the loan documents."  Ex. R, ECF No. 37.  By the natural understanding of the word 'conditional' and the plain terms of the letter, the loan was neither final nor guaranteed.

Finally, and perhaps most importantly, the Plaintiffs concede that they understood nothing was guaranteed.  PRSF ¶ 36.  John stated so repeatedly in his depositions:

Q. Did you ever believe that you were guaranteed a loan from Rocket Mortgage?

A. That I was guaranteed a loan? No.

Ex. A, ECF No. 37. 172:6-9.

Q: [I]s there anything in D-1, the Closing Disclosure, that guaranteed to you this particular loan?

A. You've asked me that many times. No.

Q. And, likewise, in [the Interest Rate Disclosure], is there anything about [the Interest Rate Disclosure] that guaranteed to you this particular loan?

A. Nope.

Q. In fact, is there anything in [the Interest Rate Disclosure] that suggested to you that the loan might not happen?

A. I haven't read all of [the Interest Rate Disclosure].

Q. There are various parts of it that -- obviously, there's smaller print and then there's some larger print and all caps and bolded print, and there is some bolded all caps print towards the bottom right over the signature blocks. Do you remember signing this document, [the Interest Rate Disclosure]?

A. I don't.

Q. Do you see right over the signature blocks there's a statement there?

A. You mean, By signing this, you acknowledge your understanding of the agreement?

Q. Above that. Did you read that part?

A. Sure. Neither this agreement nor the locking of an interest rate is a commitment to lend by lender or underwriting approval of your own application.

Q. What does that mean to you?

A. It means until you are ready to close and that Rocket Mortgage doesn't have to approve it. Certainly.

*Id*. at 189:12-191:1. Jeremy did the same:

Q. What did conditional approval mean to you? You mentioned that term earlier.

A. So conditional approval meant to me that based on the bulk of the information that we had had, that not that the loan was necessarily a guaranty at that point, but that things were looking good, and that we were on track to progress forward with the loan. I'll also say, it implied to me that when Rocket gave us conditional approval, between that letter and the communications that we had, that to a certain degree, that gave us confidence that we would not be then shopping other loans, and that this would be the best course of action.

Q. You just said that it did not mean a guarantee, or words to that effect. Can you tell us what you meant by that?

A. Sure. I mean -- so I think most people know, who have gone through a process like this before, anything with a loan certainly -- certainly, I have gone -- I have gone

through this now several times on the business side. Until the money is in the bank, nothing is a guaranty. Things fall apart or have the ability to fall apart. That's always a concern. But, again, I believe our issue was – was that at no point in the process were we given cause for concern by Rocket, or were there ever discussions that we weren't progressing as we were supposed to, including having a closing date.

Q. Did anyone from Rocket Mortgage ever guarantee you a loan?

A. Did they specifically guarantee a loan? No.

Ex. B, ECF No. 37. 168:6-169:18. From these, it is evident that Plaintiffs could not have justifiably relied on a representation that Plaintiffs would in fact receive a 3.99% loan because Plaintiffs themselves knew the loan was never guaranteed.  Sam Ward's "promise" to lock in an interest rate until May 2, 2022, thus fails for the same reason.

> c.  *RM's material omissions regarding Plaintiffs' suspended loan status and the reason Plaintiffs' loan was suspended*

The Court addresses the omissions together.  Plaintiffs argue that RM misrepresented Plaintiffs' loan status, inducing them to continue working with RM despite never intending to close on the 3.99% loan.  Specifically, Plaintiffs take issue with the fact that RM placed Plaintiffs' loan in suspended status on March 30, 2022, yet never told them.  This is compounded by the March 31, 2022, call where Samuel Ward speaks with Jeremy about the loan but does not mention that it is suspended.  This theory also reapplies the argument that RM was not forthcoming as to why the loan was suspended.

However, this fraud by omission theory "can only lie where there is a duty to disclose the omitted information."  *N. Penn Towns, LP v. Concert Golf Partners, LLC*, 554 F. Supp. 3d 665, 705 (E.D. Pa. 2021)).  "The duty to speak arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Bucci v. Wachovia Bank, N.A.*, 591 F. Supp. 2d 773, 783 (E.D. Pa. Dec. 23, 2008) (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)).  Here, the Court has already held that no such

duty existed.  *Speicher v. Rocket Mortg., LLC*, No. 5:22-CV-4284, 2023 WL 2890154 * 5 (E.D. Pa. Apr. 11, 2023).  Accordingly, this omission cannot for the basis of a fraud claim.

Since there exists no genuine issue as to the existence of any misrepresentation or reliance thereupon, the Court grants summary judgment on the fraud count.[2]

## V.      CONCLUSION

Summary judgment is entered in favor of RM as to the UTPCPL claim because Plaintiffs have not purchased anything from RM and thus cannot bring a claim under the statute.  Summary judgment is entered in favor of RM as to the common-law fraud claim because Plaintiffs have failed to establish damages with any reasonable certainty and because there exists no genuine issue as to the existence of any misrepresentation or reliance thereupon.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.* _____
JOSEPH F. LEESON, JR.
United States District Judge

---

[2]       Because the Court has granted summary judgment on both the common-law fraud and UTPCPL counts, it need not reach RM's unclean hands argument.